S. B. Strong, J. (Dissenting.)
In our examination and decision of this action, we are concluded upon the questions of fact by the findings, in the nature of a verdict, of the judge by whom it was tried. Where there is some doubt as to the extent of what is found—and I think there is in this case, at least in one particular—we have a right, and I think we are bound to look into the evidence, for the purpose of elucidation.
The questions in this case are, first, whether the check drawn by R & G. L. Schuyler upon the defendant’s bank, in favor of the plaintiffs, for $10,000, dated on the 29th day of June, 1854, was, when it was drawn or eventually, an absolute appropriation of so much money, in the hands of the drawee, in favor of the payees, so as to vest the title to it in them; second, if not, whether the defendant had a present right of set-off or counter-claim of the amount of, the two stock notes against the Schuylers, when a sufficient sum to meet the check had been deposited by them, and the check was subsequently *513 presented for payment; and, third, whether the stock notes were paid and the railroad stock redeemed by the plaintiffs as the agents of the Schuylers, or there was a sale and transfer of the notes and stock by the defendant to the plaintiffs. Another question was raised by the counsel for the defendant, on the argument, whether the stock was absolutely worthless or whether it did not create a claim against the railroad company, which can be enforced by the plaintiffs. I stated on the argument, and still think that, as the judge has found that “ the plaintiffs did not receive genuine stock under the transfer to them,” the decision of this court, in the case of the Mechanics’ Bank v. The New York and New Haven Railroad Company (3 Kern., 599), was conclusive that the plaintiffs had no valid claim either to be admitted as stockholders of the company (as the judge who tried the cause supposed they had), or to recover damages of the company by reason of the fraudulent conduct of their agent, in a particular which was extra vires. The reasoning of the learned judge who gave the opinion of the court in that case (although it was supposed by the counsel that it had been controverted by another learned judge of the same court in a subsequent case), is, in my mind, able, well supported by authority and unanswerable.
It was decided by this court, in the case of Chapman v. White (2 Seld., 412), that a check before acceptance does not operate as a transfer of its amount in the hands of the drawee, where the money had been deposited on general account and not for the specific purpose of meeting the check. Where money is deposited in the usual way, and without any specific directions, by a general dealer in the bank, it is mingled with other funds in the possession of the depositary, and, until drawn out, it is used for the ordinary purposes of the bank. It has no ear-mark nor anything to distinguish it from other moneys. The depositor has no claim upon anything specific. He is simply a creditor of the bank to the extent of his undrawn deposits. Any other principle would render the business of banking most hazardous. As it is now, when a check is presented the banker can readily ascertain the extent *514 of the funds of the drawer on deposit, and if that equals the amount of the check he can safely pay it. But he has no means of ascertaining what checks may have been drawn by the depositor, nor of knowing what he may safely pay, if an unpresented check constitutes a transfer of so much money in the bank. When the check for $10,000 was presented for payment, which was on the day of its date, the Schuylers had on deposit a balance of only $1,149. Subsequently, on the same day, about six minutes before the bank closed its daily business, they deposited $9,000, so that their balance then exceeded the amount of the check. It is probable, although it is not so found, that the last deposit was made to provide the requisite funds to meet the check. The greater probability is that the drawers supposed, when the deposit was made, that the check had been paid, and their object was to make their account (in bank phrase) good. It does hot appear that the object, whatever it was, was stated. The Schuylers had been depositors, and in fact general dealers with -the bank,for a number of years, and as there was no special communication when the last deposit was made, the officers of the bank had a right to suppose that as usual it was on general account. A special and unusual intent of one party to a transaction, unless communicated to the other party, is not obligatory upon him, nor can it affect his rights.' The check in this case did not, therefore, operate as a transfer of the fund in the bank.
Had then the bank the right to set off the amount of the stock notes of the Schuylers when the payment of the check was refused ? The notes were payable on demand.- The nominal stock was transferred as collateral security, and authority was given to sell it, on the non-performance of the promise to pay the note, without notice to the transferrers. Ho doubt the security could not be enforced until a demand of payment had been actually made. But the notes being payable on demand, a right of action existed upon them at any time, and a suit might have been sustained upon them without proving any formal demand.. It has never been doubted, I think, • that *515 a note payable on demand might be set off against any liquidated pecuniary demand of the drawer immediately after it had been made and delivered, and without any subsequent intermediate action by the holder.
The question whether there was a sale of the notes,' and what was intended as a collateral security by the defendant to the plaintiffs, or whether the plaintiffs paid the notes and received the supposed securities, as the agents of the Schuylers, is one of some difficulty, inasmuch as there is no distinct finding, one way or the other, by the judge. It is inferable, from his opinion, that he considered the transaction as amounting to a sale, because he speaks of and applies the rule of law in regard to “ the sale of stock pledged.” As, however, the fact is not distinctly stated in “ the finding of the facts ” by the judge, we must look into the circumstances for the purpose of adopting a conclusion. The three hundred and seventy shares of spurious stock which stood in the name of the Schuylers, when the stock notes were given, were, on the 1st of July, 1854, transferred to the defendant as president of the bank, and a correspondent entry was made in the books of the railroad company. He was the holder at the time of the negotiation between the plaintiffs and the cashier and agent of the bank, and until the transfer (if there was one) was made. When the plaintiffs applied to the bank for a transfer, or as the judge says an assignment, of the stock, they did not do so as the proposed agents of the Schuylers, nor had there been any previous communication between them on the subject. Neither did the plaintiffs express any intention to discharge the debt. They desired that it should be retained, in order to enable them to hold the collateral security. If the debt had been discharged, all right to hold the collateral security would have ceased.
There can be no doubt but that the intention of the plaintiffs was to purchase the securities, and it seems to me that the negotiator for the bank so understood it. True, he refused to make the proposed arrangement without the direction of the Schuylers. That would have been unnecesssary if the plain *516 tiffs had proposed to pay the debt. The bank had an unquestionable right to receive such payment without the consent of their debtors, and the cashier so supposed, for he said, “ I refer you to Messrs. Schuylers, unless it is your intention to pay the loan for them.” The application to the Schuylers was required, probably from an impression of the cashier, that the bank could not dispose of the stock without giving them notice; or possibly there may have been a mutual understanding. The plaintiffs procured a note from the Schuylers, addressed to the cashier of the bank, requesting him to deliver to them the three hundred and seventy railway shares upon their paying their notes for which those shares were pledged. Much stress was laid by the court below upon the word “paying,” but, it seems to me, without sufficient reason. It by no means follows from that, that it was intended that the money should be paid in behalf of the Schuylers, and to discharge their debt. If there had been a formal assignment, it would have been in consideration of the full amount paid. That is the usual expression in reference to moneys paid on transfers, as well as in discharge of debts. The word “ payment ” is also used in the receipts or certificates indorsed on one of the notes, but it was not used as a word of any significance, as it was not mentioned in that indorsed on the other note at the same time. The use of the word “ delivered ” in both of those papers, it was supposed, indicated that there was no transfer. But a simple delivery of the notes and the collateral security, might operate as a transfer without any writing. The expressions “delivered them” (theplaintiffs) “the securities,” although rather equivocal, would seem to indicate that they were handed over as continued securities. When a payment is. actually made by one person for another, it is customary among commercial men to state in the receipt for whom the payment is made. In these receipts the names of the Schuylers are not mentioned. It seems to me that no great importance should be attached to the use of words which might be applied either way, without any stretch of their ordinary meaning, but that the character of what was done must be inferred from the *517 entire history of the transaction. The object of the plaintiffs was clearly to preserve the securities, and that was communicated to, and I think understood by, the defendant’s agent. That the agent considered that the securities were transferred, is assumed from his statement on the trial. He there said, “I had not the slightest doubt of their validity up to the time when I made the transfer to Mr. Bement,” one of the plaintiffs.
That the plaintiffs made their purchase of the spurious stock, under the mistaken supposition that it was genuine, there can, of course, be no doubt. When they asked the cashier of the bank what security they had for the debt due from the Schuylers, he answered, “Hew Haven Railroad at 70.” Although there was no intention to deceive, yet the plaintiffs were in fact misled. The defendant held no such stock. I think that the rule is well established, that on a sale or transfer of written securities there is an implied warranty of their genuineness. Especially is that rule applicable where the writing evidences the title to personal property. In this case the alleged stock, if it had been genuine, would have been property, of which the certificate would have been the representative. The seller, therefore, impliedly warranted the title to the shares of stocks specified in the certificate, and such title wholly failed. I can see no reason why the implied warranty should not apply as well to cases where the assignor transfers property on which he has a lien only, or his supposed interest, as when he acts in the capacity of absolute owner; nor am I aware of any authority to show that there is any distinction.
In this case there was a mutual supposition that the certificate represented so much stock of the railroad company. It did not, but it was a nullity: so far as relates to that, the defendant parted with nothing and the plaintiffs obtained nothing. It is well settled that where there has been a sale of a nominal subject which had no existence, it may be rescinded and the purchase money recovered back. The rule is the same where there is a failure of what constituted the principal inducement of the sale, and without which it cannot be reasonably supposed the purchase would have been made. There the contract may *518 be dissolved in Mo. (2 Kent's Com., 468-476.) Chancellor Kent quotes in a note (a, 471), a provision in the Civil Code of Louisiana (art. 2496, 2519), in which a redhibitory action is provided for the avoidance of a sale on account- of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect that it would be supposed that the buyer would not have purchased it had he known of the vice.
I conceive, that both by reason of the breach of an implied warranty, and the entire failure of what was intended by both parties, so that what was nominally transferred was of no value, the sale in this case should be rescinded. The defendant should, however, be placed in as good a condition as he was before the transfer, and therefore the $10,000 should be deducted from the money to be refunded by him.
The judgment of the court below should be reversed, and there should be a new trial, the costs to abide the event of the suit.
Allen and Gray, Js., also dissented.
Judgment affirmed.